MAXWELL S. PELTZ, CA Bar No. 183662
Email: maxwell.peltz@cfpb.gov
Phone: 415-633-1328
PATRICIA HENSLER, FL Bar No.102303
Phone: 202-435-7829
Email: patricia.hensler@cfpb.gov
LAWRENCE D. BROWN, TX Bar No. 24040586
Phone: 202-435-7116
Email: lawrence.brown@cfpb.gov
HAI BINH NGUYEN, CA Bar No. 313503
Phone: 202-435-7251
Email: haibinh.nguyen@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Fax: 202-435-7722

Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>          Plaintiff,<br><br>          v.<br><br>Freedom Debt Relief, LLC and<br>Andrew Housser,<br><br>          Defendants. | Case No. 3:17-cv-6484<br><br>COMPLAINT |

**Complaint**                                                                                    1

1   The Consumer Financial Protection Bureau ("Bureau") files this Complaint
2   against Freedom Debt Relief, LLC ("Freedom") and Andrew Housser
3   (collectively, "Defendants") and alleges as follows:

### Introduction

4   1.   The Bureau brings this action under the Telemarketing and
5   Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C.
6   §§ 6102(c), 6105(d) (2012); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310
7   (1995) (revised 2010); and §§ 1031, 1036(a), 1054, and 1055 of the Consumer
8   Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565
9   (2012), in connection with the marketing and sale of debt-settlement or debt-
10  relief services.

### Jurisdiction

11  2.   This Court has subject-matter jurisdiction over this action because it
12  is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1),
13  presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the
14  United States, 28 U.S.C. § 1345.

### Venue

15  3.   Venue is proper in this district because Freedom and Housser are
16  located, reside, and do business here. 12 U.S.C. § 5564(f).

### Intradistrict Assignment

17  4.   Under the Local Rules of Practice in Civil Proceedings before the
18  United States District Court for the Northern District of California, this action
19  arises in the county of San Mateo because a substantial part of the events or
20  omissions giving rise to the claims occurred there. *See* Civil L.R. 3-2(c). This
21  action should therefore be assigned to the San Francisco Division or the Oakland
22  Division of this Court. *See* Civil L.R. 3-2(d).

**Complaint**                                                                    2

**Parties**

5.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). It has independent litigating authority and may secure appropriate relief for violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and the TSR, 15 U.S.C. §§ 6102(c), 6105(d).

6.     Freedom, a Delaware corporation, maintains its principal place of business at 1875 S. Grant St., Suite 400, San Mateo, CA 94402. Freedom offers and provides "financial advisory services," including debt-settlement services, to consumers owing unsecured debts to creditors. Those activities are "consumer financial services or products" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(viii)(II). Freedom is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6). Additionally, in connection with a campaign to use telephones to make interstate phone calls to consumers and to use advertisements to solicit calls from consumers to induce them to purchase its services, wherein Freedom offers to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, Freedom initiates and receives telephone calls from consumers. Thus, Freedom is a "telemarketer" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(o), (ff).

7.     Andrew Housser is the co-founder and co-CEO of Freedom. At all times material to this Complaint, Housser has exercised substantial control over and involvement in the establishment of Freedom's business policies and practices described in the Complaint. At all times material to this Complaint, Housser has exercised managerial responsibility for Freedom and has materially participated in the conduct of its affairs. Housser is therefore a "related person." 12 U.S.C. § 5481(25)(C)(i)-(ii). Because Housser is a "related person," he is deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B).

**Complaint**                                                                                   3

1

## Factual Background

2    8.    Freedom is a consumer-debt-settlement company. Established in

3  2002, Freedom claims that it has successfully negotiated and settled consumer

4  debts in excess of $7 billion for over 300,000 consumers who have enrolled in its

5  debt-settlement program.

6    9.    Freedom required consumers enrolled in its debt-settlement program

7  to deposit funds into dedicated accounts with an FDIC-insured bank. Freedom

8  claimed that once there were sufficient funds in those accounts to make

9  settlement offers to consumers' creditors, Freedom would negotiate with the

10  creditors to persuade them to accept less than the amounts actually owed.

11    10.    Freedom instructed its customers who had been making payments to

12  their creditors to withhold any further payments and to change their billing

13  addresses with their creditors to Freedom's Arizona address, 4940 South

14  Wendler Drive, Tempe, AZ 85828.

15    11.    Freedom would approve consumers for enrollment in its debt-

16  settlement program even if they were not delinquent on any debts at the time of

17  enrollment. Freedom did not independently verify hardship claims or require

18  consumers to provide supporting documentation for hardship claims as part of

19  its underwriting efforts.

20    12.    When a debt enrolled in its debt-settlement program was settled or a

21  creditor ceased attempts to collect the debt (in the absence of a settlement),

22  Freedom would charge consumers fees that typically ranged between 18% and

23  25% of the enrolled debt amount.

24  ## Freedom's Enrollment of Consumers and Lack of Disclosure

25    13.    Freedom's employees received phone calls from prospective

26  customers and initiated phone calls to prospective customers across the United

27  States to persuade them to enroll in its debt-settlement program.

28

**Complaint**                                                                                  4

14.    Before consumers enrolled in Freedom's program, Freedom pulled credit reports of prospective customers. Freedom used the credit reports to confirm in its telephone discussions with prospective customers the identities of their creditors, the amounts owed to each creditor, the underlying nature of the debt owed to each creditor, and the payment status for each debt.

15.    Freedom's underwriting department prepared a "Schedule of Creditors and Debt" listing each consumer's creditors and the amounts owed to those creditors. The Schedule of Creditors and Debt was submitted to prospective customers for review and execution, and it became "Exhibit A" of the Debt Resolution Agreement that consumers entered into with Freedom for debt-settlement services.

16.    While Freedom's Debt Resolution Agreement explained that consumers could withdraw from the program and terminate the agreement, it did not notify consumers that if they withdrew from the program, they would receive all funds in their accounts, minus any fees that Freedom had already earned.

**Freedom's Knowledge That Certain Creditors Would Not Negotiate**

17.    Freedom has long known that certain creditors have policies against negotiating with debt-settlement companies such as Freedom.

18.    For example, in late 2011, KPIX-TV ("CBS 5"), a local San Francisco television station, aired a story about two Freedom customers who complained about Freedom's inability to settle debts they owed to Chase. Chase confirmed to CBS 5 that it "does not work with debt-settlement companies." So as early as 2011, Freedom had notice that Chase would not negotiate as a matter of corporate policy.

19.    Freedom has actively sought to reverse creditors' policies against negotiating with debt-settlement companies. For years, it has maintained a team dedicated to meeting with creditors that have frequently refused to negotiate

**Complaint**                                                                                      5

with Freedom to persuade them to change their policies. On occasion, Housser accompanied this "creditor development team" on its meetings. And for years, Housser has been briefed every two weeks and has met frequently with the "creditor development team" to learn about its efforts to persuade creditors to negotiate with Freedom.

20. In 2015, Freedom requested an in-person meeting with American Express. Freedom representatives met with American Express representatives in the summer of 2015 in an effort to have American Express reverse its policy against negotiating with debt-settlement companies. Freedom did not succeed, and American Express's policy remained unchanged.

21. In 2016, Freedom requested an in-person meeting with Chase. Freedom representatives met with Chase representatives in the summer of 2016 in an effort to have Chase reverse its policy against negotiating with debt-settlement companies. Freedom did not succeed, and Chase's policy remained unchanged.

22. Freedom has held multiple in-person meetings with Discover since 2015 — including in October 2015, April 2016, and March 2017 — in an effort to have Discover reverse its policy against negotiating with debt-settlement companies. Freedom's efforts have been unsuccessful; Discover's policy has remained unchanged.

**Freedom's False Claims That All Creditors Would Negotiate**

23. Despite knowing that certain creditors would not negotiate with it, Freedom told consumers that it could negotiate all of their debts.

24. In company scripts, Freedom instructed employees in pre-enrollment telephone calls to mention its "professional Negotiations Division of 200 negotiators" and to tell consumers that Freedom would "negotiate directly with [their] creditors to settle [their] debt for less than" what was owed. In marketing materials, Freedom touted its "negotiating power." Freedom did not tell

consumers that there might be certain creditors with which it would be unable to "negotiate directly."

25.     Since 2014, Section 2 of Freedom's Debt Resolution Agreement consistently represented to consumers that Freedom would be "negotiating settlements." Section 2 further represented that "each Creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts." Exhibit A of the Debt Resolution Agreement, the "Schedule of Creditors and Debt," listed all debts a consumer enrolled in Freedom's program and the creditors associated with those debts.

26.     Freedom made this representation even when the creditors listed on the Schedule of Creditors and Debt included Chase, American Express, Discover, Macy's, Synchrony Bank, or other creditors either known to Freedom to have policies against working with debt-settlement companies or with track records of repeatedly refusing to negotiate with Freedom.

27.     Since at least 2013, when creditors refused to negotiate with Freedom, Freedom would tell some consumers to negotiate with their creditors directly and would give these consumers instructions on how to negotiate a settlement on their own. When consumers acting on their own were able to negotiate a settlement with their creditors, Freedom still charged consumers its fee, usually in the thousands of dollars per enrolled debt—even when Freedom had not directly negotiated with the creditors (or, in some cases, even communicated with the creditors).

### Freedom's Instruction to Consumers to Deceive Creditors

28.     As part of the instructions given to consumers for negotiating settlements on their own, Freedom told consumers to expressly mislead their creditors when asked directly about their enrollment in a debt-settlement program. Freedom's instructions to consumers stated: "If they ask you if you are enrolled into our program, let them know that as it pertains to this account, you

**Complaint**                                                                                     7

1  are looking to resolve it on your own." Freedom directed consumers to make this
2  representation to a creditor when the consumers were in fact enrolled in
3  Freedom's program to settle that creditor account.

4      29.    Freedom instructed consumers to represent to creditors that the
5  source of settlement funds was from family, friends, tax refunds, or the sale of a
6  vehicle. But this was not true; in fact, the funds came either from Freedom's
7  affiliated loan program or the funds consumers deposited in the dedicated
8  account set up upon their enrollment in Freedom's debt-settlement program.

9      30.    Freedom did not disclose to consumers during the enrollment
10 process that Freedom might instruct them to mislead their creditors in the event
11 those creditors refused to negotiate with Freedom.

12          **Freedom's Deception of Consumers about Chargeable Events**

13     31.    Since 2014, Section 2 of Freedom's Debt Resolution Agreement stated,
14 "We will not charge any fee for our services until we successfully resolve a debt
15 for you and you have made a payment toward the settlement of that debt." This
16 is consistent with Freedom's pre-enrollment telephone scripts, where Freedom
17 instructed its employees to tell consumers that "**NO FEES ARE ACCEPTED**
18 **UNTIL WE SETTLE A DEBT and then <u>only</u> for the debt that was settled!**"

19     32.    Contrary to this assertion, Freedom charged consumers its fee even
20 when Freedom had not successfully settled consumers' debts.

21     33.    For example, Freedom charged its fee when it had not directly
22 negotiated with the creditors—or even communicated with the creditors—
23 because the consumers had negotiated a binding settlement on their own.

24     34.    Similarly, Freedom charged its fee when a creditor, in the absence of
25 a binding settlement, stopped collecting from a consumer, sometimes following a
26 charge-off. But these consumers could still be subject to collection efforts, and
27 their credit reports could continue to reflect an unpaid or delinquent debt in the
28 trade line for that creditor.

**Complaint**                                                                8

35.     Freedom did not disclose to consumers that it would charge consumers its fee in such scenarios.

**Housser's Substantial Involvement in Freedom's Practices**

36.     Housser has the authority and responsibility to approve Freedom's policies and practices.

37.     Housser has the authority and responsibility to approve the content of the Debt Resolution Agreements.

38.     Housser's name and signature appear on all Debt Resolution Agreements with consumers.

39.     Housser knew that the statement included in all Debt Resolution Agreements that creditors would work with Freedom to negotiate settlements was not always true with respect to certain creditors. Housser knew that certain creditors had policies against negotiating with debt-settlement companies. Housser knew that Freedom was often unable to negotiate with creditors who had such policies.

40.     Housser knew that the statement included in all Debt Resolution Agreements that consumers would only be charged if Freedom negotiated a settlement and consumers made payments toward those settlements was not true. Housser knew that Freedom would charge consumers in other undisclosed scenarios.

41.     Housser approved Freedom's practice of coaching consumers when creditors would not negotiate with Freedom and approved charging consumers if they later settled their debts with creditors.

**Count I**

*Defendants' Violations of the CFPA*

*(Deceiving Consumers Regarding Creditors' Willingness to Negotiate with Freedom)*

42.     The Bureau re-alleges and incorporates by reference paragraphs 1-41.

**Complaint**                                                                                  9

1    43.    In connection with marketing its services, Freedom touted its

2  "negotiating power" and has represented to consumers that its negotiators

3  would "negotiate directly" with their creditors. In many instances, there was a

4  significant chance that Freedom would be unable to negotiate directly with

5  certain creditors having policies against negotiating with debt-settlement

6  companies. Freedom has known of these creditors' policies and of the significant

7  chance that it would be unable to negotiate directly with those creditors, and

8  Freedom has not notified consumers of these facts.

9    44.    Freedom has represented to consumers in its customized Debt

10  Resolution Agreements that it believed all creditors, including creditors with

11  which Freedom was often unable to negotiate, would work with Freedom to

12  negotiate a settlement of debts.

13    45.     Freedom's statements have created the false net impression that

14  Freedom itself would be able to negotiate directly with all creditors, including

15  those that had policies against negotiating with debt-settlement companies.

16    46.    Freedom's statements were false or misleading, were material to

17  consumers' decisions to enroll in Freedom's debt-settlement program, and

18  constituted deceptive acts and practices, in violation of §§ 1031(a) and

19  1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

20    47.    Housser has had significant responsibility for establishing Freedom's

21  policies and practices, and he has had substantial control over Freedom's

22  operations, including the content of its Debt Resolution Agreements.

23    48.    Housser directly contributed to the development, review, and

24  approval of materials containing the aforementioned deceptive statements.

25    49.    Housser's name and signature appeared on materials containing the

26  aforementioned deceptive statements.

27

28

**Complaint**                                                                    10

50.     Housser has committed or engaged in deceptive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

51.     Housser knowingly or recklessly has provided substantial assistance to Freedom, a covered person engaged in deceptive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

### Count II

*Defendants' Violations of the CFPA*
*(Deceiving Consumers Regarding Charges)*

52.     The Bureau re-alleges and incorporates by reference paragraphs 1-41.

53.     Freedom has represented to consumers that it would not charge any fee for its services until it settled a debt and consumers have made a settlement payment to the creditor. In fact, Freedom has charged consumers its fee in cases where it did not settle the consumer's debt and the consumer did not make a settlement payment.

54.     Freedom's statements concerning the circumstances when consumers would be charged fees were false or misleading, were material to consumers' decisions to enroll in Freedom's debt-settlement program, and constituted deceptive acts and practices, in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

55.     Housser has had significant responsibility for establishing Freedom's policies and practices, and he has had substantial control over Freedom's operations, including the content of its Debt Resolution Agreements.

56.     Housser directly contributed to the development, review, and approval of materials containing the aforementioned deceptive statements.

57.     Housser's name and signature appeared on materials containing the aforementioned deceptive statements.

**Complaint**                                                                              11

58.     Housser has committed or engaged in deceptive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

59.     Housser has knowingly or recklessly provided substantial assistance to Freedom, a covered person engaged in deceptive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Count III**

*Defendants' Violations of the CFPA*

*(Abusively Requiring Consumers to Negotiate on their Own)*

60.     The Bureau re-alleges and incorporates by reference paragraphs 1-41.

61.     When Freedom has been unable to negotiate with creditors, Freedom has told some consumers to negotiate with their creditors directly and has given them instructions on how to negotiate settlements on their own.

62.     Freedom's instructions to these consumers included directions to mislead their creditors by concealing the fact of their enrollment in Freedom's debt-settlement program and misrepresenting the source of the funds available for settlement.

63.     Freedom did not disclose to consumers before they enrolled in its program that they might be required to negotiate with creditors on their own, including by deceiving their creditors, in order to settle their debts. Freedom also did not disclose to consumers before they enrolled in its program that Freedom charged consumers its fee, usually in the thousands of dollars per enrolled debt, even when consumers themselves—not Freedom—negotiated the debt settlements.

64.     Freedom repeatedly has represented to consumers that Freedom would be able to negotiate with their creditors—including the specific creditors referenced in consumers' customized Debt Resolution Agreements—and did not ensure that consumers understood that certain creditors might not negotiate with

**Complaint**                                                                                                    12

Freedom. Accordingly, many of these consumers did not understand that a material condition of Freedom's debt-settlement program would be having to negotiate with creditors themselves.

65.    Freedom took unreasonable advantage of consumers' lack of understanding by, with full knowledge of its own misrepresentations and failure to correct them, enrolling consumers in its debt-settlement program who reasonably might have chosen not to enroll if they understood that they might have to negotiate with creditors themselves.

66.    Freedom's practice of enrolling consumers in its debt-settlement program under these circumstances took unreasonable advantage of the consumers' lack of understanding of the material risks, costs, or conditions of enrolling in Freedom's debt-settlement program, and it is abusive in violation of §§ 1031(d)(2)(A) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

67.    Housser has had significant responsibility for establishing Freedom's policies and practices, and he has had substantial control over Freedom's operations, including the content of its Debt Resolution Agreements and the guidance offered to consumers regarding negotiating with their creditors.

68.    Housser directly contributed to the development, review, and approval of Freedom's Debt Resolution Agreements and the guidance they offer to consumers.

69.    Housser's name and signature appeared on the Debt Resolution Agreements.

70.    Housser has committed or engaged in abusive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

**Complaint**                                                                                                13

71.     Housser has knowingly or recklessly provided substantial assistance to Freedom, a covered person engaged in abusive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## Count IV

*Defendants' Violations of the TSR and the CFPA*

*(Failure to Clearly and Conspicuously Disclose Consumers' Rights to Funds)*

72.     The Bureau re-alleges and incorporates by reference paragraphs 1-41.

73.     It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service requiring customers to place funds in an account at an insured financial institution to fail to disclose truthfully, in a clear and conspicuous manner before customers consent to pay for those services, that customers own the funds held in the accounts, that customers may withdraw from the debt-relief service at any time without penalty, and that, if customers withdraw, they must receive all funds in the accounts other than funds earned by the debt-relief service. 16 C.F.R. § 310.3(a)(1)(viii)(D).

74.     Freedom has requested or required its customers to place funds in an account at an insured financial institution.

75.     Freedom did not clearly and conspicuously disclose that if a customer withdrew, the customer must receive all funds in the account, other than funds earned by Freedom.

76.     The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

77.     Freedom's failure to disclose in a clear and conspicuous manner that consumers would receive all funds in the account was a deceptive act or practice in telemarketing, in violation of the TSR. 16 C.F.R. § 310.3(a)(1)(viii)(D).

**Complaint**                                                                                          14

78.     In addition, Freedom's violation of the TSR is treated as a violation of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Freedom therefore has also violated the CFPA. 12 U.S.C. § 5536(a)(1)(A).

79.     Housser directly contributed to the development, review, and approval of Freedom's Debt Resolution Agreements, and Housser's name and signature appeared on the Debt Resolution Agreements.

80.     Housser knew or consciously avoided knowing that Freedom failed to clearly and conspicuously disclose that consumers must receive all funds in the account other than fees earned by Freedom upon withdrawal, in violation of the TSR.

81.     Housser's conduct has violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

82.     Housser's violation of the TSR is treated as a violation of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Housser has therefore violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

83.     Housser has knowingly or recklessly provided substantial assistance to Freedom's violation of the TSR. Housser has therefore violated § 1036(a)(3) of the CFPA. 12 U.S.C. § 5536(a)(3).

### Demand for Relief

The Bureau requests that the Court:

a.     permanently enjoin Defendants from committing future violations of the Telemarketing Act, 15 U.S.C. §§ 6102(c), 6105(d); the TSR, 16 C.F.R. pt. 310; and §§ 1031, 1036(a) of the CFPA, 12 U.S.C. §§ 5531, 5536(a), and any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.     grant additional injunctive relief as the Court may deem just and proper;

**Complaint**                                                                                          15

c.    order Defendants to pay redress to consumers harmed by its
      unlawful conduct;

d.    order Defendants to disgorge all ill-gotten gains;

e.    impose on Defendants civil money penalties;

f.    award costs against Defendants; and

g.    award additional relief as the Court may determine to be just and
      proper.

Dated: November 8, 2017                 Respectfully Submitted,

                                        Anthony Alexis (DC Bar No. 384545)
                                        *Enforcement Director*
                                        Jeffrey Paul Ehrlich (FL Bar No. 51561)
                                        *Deputy Enforcement Director*
                                        Kara Miller (VA Bar No. 47821)
                                        *Assistant Litigation Deputy*

                                        s/ Maxwell S. Peltz
                                        _____
                                        Maxwell S. Peltz (CA Bar No. 183662)
                                        Patricia H. Hensler (FL Bar No. 102303)
                                        Lawrence D. Brown (TX Bar No. 24040586)
                                        Hai Binh Nguyen (CA Bar No. 313503)
                                        *Enforcement Attorneys*
                                        Consumer Financial Protection Bureau
                                        1700 G Street, NW
                                        Washington, DC 20552
                                        Telephone (Peltz): 415-633-1328
                                        Telephone (Hensler): 202-435-7829
                                        Telephone (Brown): 202-435-7116
                                        Telephone (Nguyen): 202-435-7251
                                        Fax: 202-435-7722
                                        Email: maxwell.peltz@cfpb.gov
                                        Email: patricia.hensler@cfpb.gov
                                        Email: lawrence.brown@cfpb.gov
                                        Email: haibinh.nguyen@cfpb.gov

                                        *Attorneys for Consumer Financial Protection Bureau*

**Complaint**                                                                16