MAXWELL S. PELTZ, CA Bar No. 183662
Email: maxwell.peltz@cfpb.gov
Phone: 415-633-1328
PATRICIA HENSLER, FL Bar No.102303
Phone: 202-435-7829
Email: patricia.hensler@cfpb.gov
LAWRENCE D. BROWN, TX Bar No. 24040586
Phone: 202-435-7116
Email: lawrence.brown@cfpb.gov
HAI BINH NGUYEN, CA Bar No. 313503
Phone: 202-435-7251
Email: haibinh.nguyen@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Fax: 415-844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>             Plaintiff,<br><br>        v.<br><br>Freedom Debt Relief, LLC and Andrew Housser,<br><br>             Defendants. | Case No. 3:17-cv-6484<br><br>FIRST AMENDED COMPLAINT |

First Amended Complaint
Case No. 17-cv-6484-EDL

1

The Consumer Financial Protection Bureau ("Bureau") files this First Amended Complaint against Freedom Debt Relief, LLC ("Freedom") and Andrew Housser (collectively, "Defendants") and alleges as follows:

## Introduction

1.     The Bureau brings this action under the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6102(c), 6105(d) (2012); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310 (1995) (revised 2010); and §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565 (2012), in connection with the marketing and sale of debt-settlement or debt-relief services.

## Jurisdiction

2.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

## Venue

3.     Venue is proper in this district because Freedom and Housser are located, reside, and do business here. 12 U.S.C. § 5564(f).

## Intradistrict Assignment

4.     Under the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California, this action arises in the county of San Mateo because a substantial part of the events or omissions giving rise to the claims occurred there. *See* Civil L.R. 3-2(c). This action should therefore be assigned to the San Francisco Division or the Oakland Division of this Court. *See* Civil L.R. 3-2(d).

First Amended Complaint
Case No. 17-cv-6484-EDL

**Parties**

5.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). It has independent litigating authority and may secure appropriate relief for violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and the TSR, 15 U.S.C. §§ 6102(c), 6105(d).

6.     Freedom, a Delaware corporation, maintains its principal place of business at 1875 S. Grant St., Suite 400, San Mateo, CA 94402. Freedom offers and provides "financial advisory services," including debt-settlement services, to consumers owing unsecured debts to creditors. Those activities are "consumer financial services or products" under the CFPA. 12 U.S.C. § 5481(5)(A), (15)(A)(viii)(II). Freedom is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6). Additionally, in connection with a campaign to use telephones to make interstate phone calls to consumers and to use advertisements to solicit calls from consumers to induce them to purchase its services, wherein Freedom offers to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, Freedom initiates and receives telephone calls from consumers. Thus, Freedom is a "telemarketer" offering a "debt relief service" under the TSR. 16 C.F.R. § 310.2(o), (ff).

7.     Andrew Housser is the co-founder and co-CEO of Freedom. At all times material to this Complaint, Housser has exercised substantial control over and involvement in the establishment of Freedom's business policies and practices described in the Complaint. At all times material to this Complaint, Housser has exercised managerial responsibility for Freedom and has materially participated in the conduct of its affairs. Housser is therefore a "related person." 12 U.S.C. § 5481(25)(C)(i)-(ii). Because Housser is a "related person," he is deemed a "covered person" under the CFPA. 12 U.S.C. § 5481(25)(B).

First Amended Complaint
Case No. 17-cv-6484-EDL

1

## Factual Background

2       8.      Freedom is a consumer-debt-settlement company. Established in

3   2002, Freedom claims that it has successfully negotiated and settled consumer

4   debts in excess of $7 billion for over 450,000 consumers who have enrolled in its

5   debt-settlement program.

6       9.      Freedom required consumers enrolled in its debt-settlement program

7   to deposit funds into dedicated accounts with an FDIC-insured bank. Freedom

8   claimed that once there were sufficient funds in those accounts to make

9   settlement offers to consumers' creditors, Freedom would negotiate with the

10  creditors to persuade them to accept less than the amounts actually owed.

11      10.     Freedom instructed its customers who had been making payments to

12  their creditors to withhold any further payments and to change their billing

13  addresses with their creditors to Freedom's Arizona address, 4940 South

14  Wendler Drive, Tempe, AZ 85828.

15      11.     Freedom would approve consumers for enrollment in its debt-

16  settlement program even if they were not delinquent on any debts at the time of

17  enrollment. Freedom did not independently verify hardship claims or require

18  consumers to provide supporting documentation for hardship claims as part of

19  its underwriting efforts.

20      12.     When a debt enrolled in its debt-settlement program was settled or a

21  creditor ceased attempts to collect the debt (in the absence of a settlement),

22  Freedom would charge consumers fees that typically ranged between 18% and

23  25% of the enrolled debt amount.

24      ## Freedom's Enrollment of Consumers and Lack of Disclosure

25      13.     Freedom's employees received phone calls from prospective

26  customers and initiated phone calls to prospective customers across the United

27  States to persuade them to enroll in its debt-settlement program.

28  First Amended Complaint
Case No. 17-cv-6484-EDL

14.     Before consumers enrolled in Freedom's program, Freedom pulled credit reports of prospective customers. Freedom used the credit reports to confirm in its telephone discussions with prospective customers the identities of their creditors, the amounts owed to each creditor, the underlying nature of the debt owed to each creditor, and the payment status for each debt.

15.     Freedom's underwriting department prepared a "Schedule of Creditors and Debt" listing each consumer's creditors and the amounts owed to those creditors. The Schedule of Creditors and Debt was submitted to prospective customers for review and execution, and it became "Exhibit A" of the Debt Resolution Agreement that consumers entered into with Freedom for debt-settlement services.

16.     While Freedom's Debt Resolution Agreement explained that consumers could withdraw from the program and terminate the agreement, it did not notify consumers that if they withdrew from the program, they would receive all funds in their accounts, minus any fees that Freedom had already earned.

**Freedom's Knowledge That Certain Creditors Would Not Negotiate**

17.     Freedom has long known that certain creditors have policies against negotiating with debt-settlement companies such as Freedom.

18.     For example, in late 2011, KPIX-TV ("CBS 5"), a local San Francisco television station, aired a story about two Freedom customers who complained about Freedom's inability to settle debts they owed to Chase. Chase confirmed to CBS 5 that it "does not work with debt-settlement companies." So as early as 2011, Freedom had notice and knew or should have known that Chase would not negotiate as a matter of corporate policy.

19.     Freedom has actively sought to reverse creditors' policies against negotiating with debt-settlement companies. For years, it has maintained a team

First Amended Complaint
Case No. 17-cv-6484-EDL

dedicated to meeting with creditors that have frequently refused to negotiate with Freedom to persuade them to change their policies. On occasion, Housser accompanied this "creditor development team" on its meetings. And for years, Housser has received regular updates (typically every two weeks) from the "creditor development team" and has met frequently with the team to learn about its efforts to persuade creditors to negotiate with Freedom.

20.     In 2015, Freedom requested an in-person meeting with American Express. Freedom representatives met with American Express representatives in the summer of 2015 in an effort to have American Express reverse its policy against negotiating with debt-settlement companies. Freedom did not succeed, and American Express's policy remained unchanged.

21.     In 2016, Freedom requested an in-person meeting with Chase. Freedom representatives met with Chase representatives in the summer of 2016 in an effort to have Chase reverse its policy against negotiating with debt-settlement companies. Freedom did not succeed, and Chase's policy remained unchanged.

22.     Freedom has held multiple in-person meetings with Discover since 2015—including in October 2015, April 2016, and March 2017—in an effort to have Discover reverse its policy against negotiating with debt-settlement companies. Freedom's efforts have been unsuccessful; Discover's policy has remained unchanged.

### Freedom's False Claims That All Creditors Would Negotiate

23.     Despite knowing that certain creditors would not negotiate with it, Freedom told consumers that it could negotiate all of their debts.

24.     In company scripts, Freedom instructed employees in pre-enrollment telephone calls to mention its "professional Negotiations Division of 200 negotiators" and to tell consumers that Freedom would "negotiate directly with

First Amended Complaint
Case No. 17-cv-6484-EDL

[their] creditors to settle [their] debt for less than" what was owed. In marketing materials, Freedom touted its "negotiating power." Freedom did not tell consumers that there might be certain creditors with which it would be unable to "negotiate directly."

25.    Since at least 2012, Section 2 of Freedom's Debt Resolution Agreement consistently represented to consumers that Freedom would be "negotiating settlements." Section 2 further represented that "each Creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts." Exhibit A of the Debt Resolution Agreement, the "Schedule of Creditors and Debt," listed all debts that a consumer enrolled in Freedom's program and the creditors associated with those debts.

26.    Freedom made this representation even when the creditors listed on the Schedule of Creditors and Debt included Chase, American Express, Discover, Macy's, Synchrony Bank, or other creditors either known to Freedom to have policies against working with debt-settlement companies or with track records of repeatedly refusing to negotiate with Freedom.

27.    Since at least 2013, when creditors refused to negotiate with Freedom, Freedom would tell some consumers to negotiate with their creditors directly and would give these consumers instructions on how to negotiate a settlement on their own. Typically, it was only after consumers had been enrolled in Freedom's program for months or years that Freedom revealed that one or more of the consumers' creditors refused to negotiate with Freedom and told consumers that they would need to negotiate directly with those creditors. When consumers acting on their own were able to negotiate a settlement with a creditor, Freedom still charged consumers its fee, usually in the thousands of dollars per enrolled debt—even when Freedom had not directly negotiated with the creditor (or, in some cases, even communicated with the creditor).

First Amended Complaint
Case No. 17-cv-6484-EDL

7

**Freedom's Instruction to Consumers to Deceive Creditors**

28.     As part of the instructions given to consumers for negotiating settlements on their own, Freedom told consumers to expressly mislead their creditors when asked directly about their enrollment in a debt-settlement program. Freedom's instructions to consumers stated: "If they ask you if you are enrolled into our program, let them know that as it pertains to this account, you are looking to resolve it on your own." Freedom directed consumers to make this representation to a creditor when the consumers were in fact enrolled in Freedom's program to settle that creditor account.

29.     Freedom instructed consumers to represent to creditors that the source of settlement funds was from family, friends, tax refunds, or the sale of a vehicle. But this was not true; in fact, the funds came either from Freedom's affiliated loan program or from the funds consumers deposited in the dedicated account set up upon their enrollment in Freedom's debt-settlement program.

30.     Freedom did not disclose to consumers during the enrollment process that Freedom might instruct them to mislead their creditors in the event those creditors refused to negotiate with Freedom.

**Freedom's Deception of Consumers about Chargeable Events**

31.     Since at least 2012, Section 1 of Freedom's Debt Resolution Agreement stated, "We will not charge any fee for our services until we successfully resolve a debt for you and you have made a payment toward the settlement of that debt." This is consistent with Freedom's pre-enrollment telephone scripts, where Freedom instructed its employees to tell consumers that "**NO FEES ARE ACCEPTED UNTIL WE SETTLE A DEBT and then <u>only</u> for the debt that was settled!**"

32.     Contrary to this assertion, Freedom charged consumers its fee even when Freedom had not successfully settled consumers' debts.

First Amended Complaint
Case No. 17-cv-6484-EDL

33.     For example, Freedom charged its fee when it had not directly negotiated with the creditors—or even communicated with the creditors—because the consumers had negotiated a binding settlement on their own.

34.     Similarly, Freedom charged its fee when a creditor, in the absence of a binding settlement, stopped collecting from a consumer, sometimes following a charge-off. In such circumstances, the consumer had not executed a settlement agreement and had made no settlement payment to the creditor or any debt collector before Freedom charged its fee. These consumers nevertheless could still be subject to collection efforts, and their credit reports could continue to reflect an unpaid or delinquent debt in the trade line for that creditor.

35.     Freedom did not disclose to consumers that it would charge consumers its fee in such scenarios. And consumers did not agree to pay fees in such scenarios when they enrolled in Freedom's program.

36.     Freedom's representations— regarding its ability to negotiate with creditors, creditors' willingness to negotiate with Freedom, and the circumstances in which it would charge fees— were likely to mislead consumers acting reasonably when enrolling in Freedom's debt-settlement program and when deciding whether to remain enrolled.

37.     During the period that consumers were enrolled in Freedom's program—typically months or years—Freedom required consumers to deposit funds into dedicated accounts and instructed consumers that if they had been making payments to their creditors, they should withhold any further payments and instead make payments into the dedicated accounts. This included consumers who had not previously been delinquent on their accounts. Such extended delinquencies negatively impacted consumers' credit, resulted in consumers being charged late fees, penalties, and additional interest, and

First Amended Complaint
Case No. 17-cv-6484-EDL

subjected consumers to ongoing collection activity and threatened and actual legal action by creditors.

38.     Consumers who were charged fees after having to negotiate a settlement on their own or after Freedom allowed a charge-off instead of negotiating a settlement typically had been enrolled in Freedom's program for months or years, during which they were subject to the consequences of extended delinquencies.

### Housser's Substantial Involvement in Freedom's Practices

39.     Housser has had the authority and responsibility to approve Freedom's policies and practices.

40.     Housser has had the authority and responsibility to approve the content of the Debt Resolution Agreements.

41.     Housser's name and signature have appeared on all Debt Resolution Agreements with consumers.

42.     Housser has known that the statement included in all Debt Resolution Agreements that creditors would work with Freedom to negotiate settlements was not always true with respect to certain creditors. Housser has known that certain creditors had policies against negotiating with debt-settlement companies. Housser has known that Freedom was often unable to negotiate with creditors who had such policies.

43.     Housser has known that the statement included in all Debt Resolution Agreements that consumers would only be charged if Freedom negotiated a settlement and consumers made payments toward those settlements was not true. Housser has known that Freedom would charge consumers in other undisclosed scenarios.

First Amended Complaint
Case No. 17-cv-6484-EDL

44.     Housser has approved Freedom's practice of coaching consumers when creditors would not negotiate with Freedom and has approved charging consumers if they later settled their debts with creditors.

45.     Housser has had knowledge of and control over Freedom's fee-charging practices, including its charging of fees in the absence of a binding settlement or any consumer payment on a settlement.

### Count I

*Defendants' Violations of the CFPA*

*(Deceiving Consumers Regarding Creditors' Willingness to Negotiate with Freedom)*

46.     The Bureau re-alleges and incorporates by reference paragraphs 1-45.

47.     In connection with marketing its services, Freedom touted its "negotiating power" and has represented to consumers that its negotiators would "negotiate directly" with their creditors. In many instances, there was a significant chance that Freedom would be unable to negotiate directly with certain creditors having policies against negotiating with debt-settlement companies. Freedom has known of these creditors' policies and of the significant chance that it would be unable to negotiate directly with those creditors, and Freedom has not notified consumers of these facts.

48.     Freedom has represented to consumers in its customized Debt Resolution Agreements that it believed all creditors, including creditors with which Freedom was often unable to negotiate, would work with Freedom to negotiate a settlement of debts.

49.      Freedom's statements have created the false net impression that Freedom itself would be able to negotiate directly with all creditors, including those that had policies against negotiating with debt-settlement companies.

50.     Freedom's statements were false or misleading, were material to consumers' decisions to enroll in Freedom's debt-settlement program, and

First Amended Complaint
Case No. 17-cv-6484-EDL

11

constituted deceptive acts and practices, in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

51.  Housser has had significant responsibility for establishing Freedom's policies and practices, and he has had substantial control over Freedom's operations, including the content of its Debt Resolution Agreements.

52.  Housser directly contributed to the development, review, and approval of materials containing the aforementioned deceptive statements.

53.  Housser's name and signature appeared on materials containing the aforementioned deceptive statements.

54.  Housser has committed or engaged in deceptive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

55.  Housser knowingly or recklessly has provided substantial assistance to Freedom, a covered person engaged in deceptive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## Count II

*Defendants' Violations of the CFPA*

*(Deceiving Consumers Regarding Charges)*

56.  The Bureau re-alleges and incorporates by reference paragraphs 1-45.

57.  Freedom has represented to consumers that it would not charge any fee for its services until it settled a debt and consumers have made a settlement payment to the creditor. In fact, Freedom has charged consumers its fee in cases where it did not settle the consumer's debt and the consumer did not make a settlement payment.

58.  Freedom's statements concerning the circumstances when consumers would be charged fees were false or misleading, were material to consumers' decisions to enroll in Freedom's debt-settlement program, and constituted

First Amended Complaint
Case No. 17-cv-6484-EDL

deceptive acts and practices, in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

59.    Housser has had significant responsibility for establishing Freedom's policies and practices, and he has had substantial control over Freedom's operations, including the content of its Debt Resolution Agreements.

60.    Housser directly contributed to the development, review, and approval of materials containing the aforementioned deceptive statements.

61.    Housser's name and signature appeared on materials containing the aforementioned deceptive statements.

62.    Housser has committed or engaged in deceptive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

63.    Housser has knowingly or recklessly provided substantial assistance to Freedom, a covered person engaged in deceptive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Count III**

*Defendants' Violations of the CFPA*

*(Abusively Requiring Consumers to Negotiate on their Own)*

64.    The Bureau re-alleges and incorporates by reference paragraphs 1-45.

65.    When Freedom has been unable to negotiate with creditors, Freedom has told some consumers to negotiate with their creditors directly and has given them instructions on how to negotiate settlements on their own.

66.    Freedom's instructions to these consumers included directions to mislead their creditors by concealing the fact of their enrollment in Freedom's debt-settlement program and misrepresenting the source of the funds available for settlement.

First Amended Complaint
Case No. 17-cv-6484-EDL

67. Freedom did not disclose to consumers before they enrolled in its program that they might be required to negotiate with creditors on their own, including by deceiving their creditors, in order to settle their debts. Freedom also did not disclose to consumers before they enrolled in its program that Freedom charged consumers its fee, usually in the thousands of dollars per enrolled debt, even when consumers themselves—not Freedom—negotiated the debt settlements.

68. Freedom repeatedly has represented to consumers that Freedom would be able to negotiate with their creditors—including the specific creditors referenced in consumers' customized Debt Resolution Agreements—and did not ensure that consumers understood that certain creditors might not negotiate with Freedom. Accordingly, many of these consumers did not understand that a material condition of Freedom's debt-settlement program would be having to negotiate with creditors themselves. Typically, Freedom only revealed to consumers that one or more of their creditors would not negotiate with Freedom and told consumers that they would need to negotiate directly with those creditors after consumers had been enrolled in Freedom's program for months or years—having borne the costs and consequences of extended delinquencies and forgone other debt-settlement alternatives.

69. Freedom took unreasonable advantage of consumers' lack of understanding by, with full knowledge of its own misrepresentations and failure to correct them, enrolling consumers in its debt-settlement program who reasonably might have chosen not to enroll if they understood that they might have to negotiate with creditors themselves and be instructed by Freedom to mislead those creditors during negotiations.

70. Freedom's practice of enrolling consumers in its debt-settlement program under these circumstances took unreasonable advantage of the

First Amended Complaint
Case No. 17-cv-6484-EDL

14

consumers' lack of understanding of the material risks, costs, or conditions of enrolling in Freedom's debt-settlement program, and it is abusive in violation of §§ 1031(d)(2)(A) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

71.     Housser has had significant responsibility for establishing Freedom's policies and practices, and he has had substantial control over Freedom's operations, including the content of its Debt Resolution Agreements and the guidance offered to consumers regarding negotiating with their creditors.

72.     Housser directly contributed to the development, review, and approval of Freedom's Debt Resolution Agreements and the guidance they offer to consumers.

73.     Housser's name and signature appeared on the Debt Resolution Agreements.

74.     Housser has committed or engaged in abusive acts or practices in connection with the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

75.     Housser has knowingly or recklessly provided substantial assistance to Freedom, a covered person engaged in abusive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Count IV**

*Defendants' Violations of the TSR and the CFPA*

*(Failure to Clearly and Conspicuously Disclose Consumers' Rights to Funds)*

76.     The Bureau re-alleges and incorporates by reference paragraphs 1-45.

77.     It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service requiring customers to place funds in an account at an insured financial institution to fail to disclose truthfully, in a clear and conspicuous manner before customers consent to pay for those services, that

First Amended Complaint
Case No. 17-cv-6484-EDL

customers own the funds held in the accounts, that customers may withdraw from the debt-relief service at any time without penalty, and that, if customers withdraw, they must receive all funds in the accounts other than funds earned by the debt-relief service. 16 C.F.R. § 310.3(a)(1)(viii)(D).

78.     Freedom has requested or required its customers to place funds in an account at an insured financial institution.

79.     Freedom did not clearly and conspicuously disclose that if a customer withdrew, the customer must receive all funds in the account, other than funds earned by Freedom.

80.     The Bureau is authorized to enforce the Telemarketing Act with respect to the offering or provision of a consumer financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).

81.     Freedom's failure to disclose in a clear and conspicuous manner that consumers would receive all funds in the account was a deceptive act or practice in telemarketing, in violation of the TSR. 16 C.F.R. § 310.3(a)(1)(viii)(D).

82.     In addition, Freedom's violation of the TSR is treated as a violation of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Freedom therefore has also violated the CFPA. 12 U.S.C. § 5536(a)(1)(A).

83.     Housser directly contributed to the development, review, and approval of Freedom's Debt Resolution Agreements, and Housser's name and signature appeared on the Debt Resolution Agreements.

84.     Housser knew or consciously avoided knowing that Freedom failed to clearly and conspicuously disclose that consumers must receive all funds in the account other than fees earned by Freedom upon withdrawal, in violation of the TSR.

85.     Housser has violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

First Amended Complaint
Case No. 17-cv-6484-EDL

16

86.   Housser's violation of the TSR is treated as a violation of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Housser has therefore violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

87.   Housser has knowingly or recklessly provided substantial assistance to Freedom's violation of the TSR. Housser has therefore violated § 1036(a)(3) of the CFPA. 12 U.S.C. § 5536(a)(3).

### Count V

*Defendants' Violations of the TSR and the CFPA*
*(Charging Fees in the Absence of a Settlement)*

88.   The Bureau re-alleges and incorporates by reference paragraphs 1-45.

89.   It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (1) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; (2) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and (3) where the debts are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration must be proportional to the debts that have been so settled, or else charged at a flat percentage of the amount saved as a result of such settlements. 16 C.F.R. § 310.4(a)(5)(i).

90.   Freedom has requested and received fees from consumers in connection with enrolled debts even though Freedom had not renegotiated, settled, reduced, or otherwise altered the terms of these debts pursuant to a settlement agreement, debt-management plan, or other such valid contractual

First Amended Complaint
Case No. 17-cv-6484-EDL

1   agreement executed by the consumers and even though the consumers had not

2   made any payments pursuant to a settlement agreement, debt-management plan,

3   or other valid contractual agreement between the consumers and the creditor or

4   debt collector.

5       91.    Where consumers' debts were purportedly renegotiated, settled,

6   reduced, or otherwise altered individually, Freedom has also requested and

7   received fees from consumers in connection with enrolled debts that were not

8   proportional due to the absence of a binding settlement and that were also not

9   charged at a flat percentage of the amount saved as a result of such settlements.

10      92.    The Bureau is authorized to enforce the Telemarketing Act with

11  respect to the offering or provision of a consumer financial product or service

12  subject to the CFPA. 15 U.S.C. § 6105(d).

13      93.    Freedom's requesting or receiving payment of fees from consumers

14  under the circumstances described in paragraph 90 was an abusive act or

15  practice in telemarketing, in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i).

16      94.    In addition, Freedom's violation of the TSR is treated as a violation of

17  a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Freedom therefore has also

18  violated the CFPA. 12 U.S.C. § 5536(a)(1)(A).

19      95.    Housser has had significant responsibility for establishing Freedom's

20  policies and practices, and he has had substantial control over Freedom's

21  operations, including its fee-charging practices.

22      96.    Housser knew or consciously avoided knowing that Freedom

23  requested or received payment of fees from consumers under the circumstances

24  described in paragraph 90.

25      97.    Housser has violated the TSR's ban on assisting and facilitating

26  others' violations of that rule. 16 C.F.R. § 310.3(b).

27

28
First Amended Complaint
Case No. 17-cv-6484-EDL

98.     Housser's violation of the TSR is treated as a violation of a rule under § 1031 of the CFPA. 15 U.S.C. § 6102(c). Housser has therefore violated § 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

99.     Housser has knowingly or recklessly provided substantial assistance to Freedom's violation of the TSR. Housser has therefore violated § 1036(a)(3) of the CFPA. 12 U.S.C. § 5536(a)(3).

## Demand for Relief

The Bureau requests that the Court:

a.     permanently enjoin Defendants from committing future violations of the Telemarketing Act, 15 U.S.C. §§ 6102(c), 6105(d); the TSR, 16 C.F.R. pt. 310; and §§ 1031, 1036(a) of the CFPA, 12 U.S.C. §§ 5531, 5536(a), and any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.     grant additional injunctive relief as the Court may deem just and proper;

c.     order Defendants to pay redress to consumers harmed by its unlawful conduct;

d.     order Defendants to disgorge all ill-gotten gains;

e.     impose on Defendants civil money penalties;

f.     award costs against Defendants; and

g.     award additional relief as the Court may determine to be just and proper.

Dated: June 1, 2018          Respectfully Submitted,

Kristen A. Donoghue (DC Bar No. 456707)
*Enforcement Director*
Jeffrey Paul Ehrlich (FL Bar No. 51561)

First Amended Complaint
Case No. 17-cv-6484-EDL

19

1
2

*Deputy Enforcement Director*
Kara Miller (VA Bar No. 47821)
*Assistant Litigation Deputy*

3

s/ Maxwell S. Peltz

4
5
6

Maxwell S. Peltz (CA Bar No. 183662)
Patricia H. Hensler (FL Bar No. 102303)
Lawrence D. Brown (TX Bar No. 24040586)
Hai Binh Nguyen (CA Bar No. 313503)

7
8
9
10
11
12
13
14
15
16

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone (Peltz): 415-633-1328
Telephone (Hensler): 202-435-7829
Telephone (Brown): 202-435-7116
Telephone (Nguyen): 202-435-7251
Fax: 415-844-9788
Email: maxwell.peltz@cfpb.gov
Email: patricia.hensler@cfpb.gov
Email: lawrence.brown@cfpb.gov
Email: haibinh.nguyen@cfpb.gov

17

*Attorneys for Consumer Financial Protection Bureau*

18
19
20
21
22
23
24
25
26
27
28

First Amended Complaint
Case No. 17-cv-6484-EDL