JOSEPH L. BARLOON (*pro hac vice*)
joseph.barloon@skadden.com
ANAND S. RAMAN (*pro hac vice*)
anand.raman@skadden.com
JOHN A.J. BARKMEYER (*pro hac vice*)
john.barkmeyer@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:   (202) 371-7000
Facsimile:    (202) 393-5760

ALLEN J. RUBY (SBN 47109)
allen.ruby@skadden.com
ABRAHAM M. ANDRADE III (SBN 321264)
abraham.andrade@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone:  (650) 470-4500
Facsimile:   (650) 470-4570

Attorneys for Defendant
FREEDOM DEBT RELIEF, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                Plaintiff,<br><br>     v.<br><br>FREEDOM DEBT RELIEF, LLC and ANDREW HOUSSER,<br><br>                Defendants. | CASE NO.: 3:17-cv-06484-EDL<br><br>(1) **DEFENDANT FREEDOM DEBT RELIEF, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS CFPB'S FIRST AMENDED COMPLAINT**;<br><br>(Under separate cover)<br><br>(2) **DECLARATION OF ALLEN J. RUBY**;<br><br>(3) **[PROPOSED] ORDER**.<br><br>Judge: Hon. Elizabeth D. Laporte<br><br>Date:     September 18, 2018<br><br>Time:    2:00 p.m.<br>Courtroom:  E, 15th Floor |

**<u>DEFENDANT FREEDOM DEBT RELIEF, LLC'S MOTION TO DISMISS</u>**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:** PLEASE TAKE NOTICE THAT on September 18, 2018, at 2:00 p.m., at the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Courtroom E, Fifteenth Floor, Defendant Freedom Debt Relief, LLC ("Freedom") will, and hereby does, move the Court to dismiss all claims in the operative complaint in this matter, the First Amended Complaint (ECF No. 55, the "FAC" or "Complaint"), filed by Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"). This motion is based on the below memorandum of points and authorities and any evidence or argument that may be presented at a hearing on this matter.

Freedom hereby moves the Court to dismiss Counts I through V of the Complaint for the following reasons:

- Each of the five counts of the Complaint fails to state a claim upon which the Court may grant relief.
- The Consumer Financial Protection Act, which establishes the Bureau, is unconstitutional and cannot be remedied by severance of its unconstitutional elements.

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ........................................................................... 4

    A.   *The Parties* ................................................................................ 4

    B.   *Freedom's Business* ................................................................... 4

ARGUMENT ................................................................................................. 6

I.   Legal Standard ........................................................................... 6

II.  Freedom's Statement of Its Belief That Creditors Would Negotiate With It Was Not Deceptive ...................................... 7

    A.   *FTC Rulemaking Preempts Liability for Not Disclosing Creditors' Stances Towards Negotiation* ............................... 7

    B.   *The Complaint's Admission That Freedom Did Negotiate With All Creditors Dooms Its Claim That Freedom's Statements Were Deceptive* ........................................... 9

    C.   *The Complaint Fails to Plead the Existence of Any Consumer Harm* ................................................................. 11

III. Freedom's Representations About Its Fee Structure Were Not Deceptive ................................................................................. 14

IV. Coaching Was Not an Abusive Practice ..................................... 16

    A.   *Coaching Was Not a Material Risk, Cost or Condition of Freedom's Debt Settlement Services* ................................. 16

    B.   *Freedom Did Not Take Advantage of Its Clients* ................ 18

V.  The Plain Text of the Contract Reveals That Freedom Did Not Violate the TSR's Disclosure Requirements ........................... 19

VI. Freedom Did Not Violate the Advance Fee Prohibition ............. 20

VII. The Act Is Unconstitutional ....................................................... 21

    A.   *The Grant of Unchecked Power to the Bureau Director Violates the Constitution* ......................................................... 22

    B.   *The Only Adequate Remedy for the Act's Constitutional Defect Is Dismissal* ................................................................. 23

CONCLUSION .............................................................................................. 25

**Cases**

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987)..................................................................................24

*Arkansas Electric Co-operative Corp. v. Arkansas Public Service Commission,*
    461 U.S. 375 (1983)................................................................................8, 9

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................6, 7

*Branch v. Tunnell,*
    14 F.3d 449 (9th Cir. 1994) .......................................................................7

*CFPB v. All American Check Cashing, Inc.,*
    No. 18-90015 (5th Cir.) .......................................................................22, 23

*CFPB v. CashCall, Inc.,*
    No. 2:15-cv-07522-JFW-RAO (C.D. Cal. Jan. 19, 2018) .....................................13

*CFPB v. Corinthian Colleges, Inc.,*
    No. 1:14-cv-07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015) .......................10

*CFPB v. D & D Marketing,*
    No. 2:15-cv-09692 PSG (Ex), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) .22, 23

*CFPB v. Future Income Payments, LLC,*
    No. 17-55721 (9th Cir.) ...........................................................................22

*CFPB v. Gordon,*
    819 F.3d 1179 (9th Cir. 2016) ........................................................9, 10, 12

*CFPB v. Intercept Corp.,*
    No. 3:16–cv–144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017) ............................18

*CFPB v. ITT Educational Services, Inc.,*
    219 F. Supp. 3d 878 (S.D. Ind. 2015).........................................................18

*CFPB v. Morgan Drexen, Inc.,*
    No. SACV 13-1267-JLS (JEMx), 2014 WL 12581776 (C.D. Cal. Nov. 25, 2014) ........................................................................................10, 13

*CFPB v. Nationwide Biweekly Administration, Inc.,*
    No. 15-cv-02106-RS, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) .....................10

*CFPB v. RD Legal Funding, LLC,*
    No. 1:17-cv-00890-LAP (S.D.N.Y. June 21, 2018).........................................22, 24

*CFPB v. Seila Law LLC,*
No. 17-56324 (9th Cir.) ....................................................................................22

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012)........................................................................................8, 9

*Free Enter. Fund v. Public Accounting Oversight Bd.,*
561 U.S. 477 (2010)..........................................................................................22

*FTC v. Cantkier,*
767 F. Supp. 2d 147 (D.D.C. 2011) ..................................................................11

*FTC v. Lights of Am., Inc.,*
No. SACV10–01333 JVS (MLGx), 2013 WL 5230681 (C.D. Cal. Sept. 17, 2013) ................................................................................................................11

*FTC v. Springtech 77376 LLC,*
No. C–12–04631 PJH (EDL), 2013 WL 5955395 (N.D. Cal. Oct. 28, 2013) ........11

*Galbraith v. County of Santa Clara,*
307 F.3d 1119 (9th Cir. 2002) ............................................................................7

*Humphrey's Executor v. United States,*
295 U.S. 602 (1935)..........................................................................................23

*In re Cliffdale Associates, Inc.,*
103 F.T.C. 110 (1984) .......................................................................................11

*Morrison v. Olson,*
487 U.S. 654 (1988)..........................................................................................22

*Moyo v. Gomez,*
40 F.3d 982 (9th Cir. 1994) ................................................................................6

*Myers v. United States,*
272 U.S. 52 (1926)............................................................................................22

*PHH Corp. v. CFPB,*
839 F.3d 1 (D.C. Cir. 2016)........................................................................23, 24

*PHH Corp. v. CFPB,*
881 F.3d 75 (D.C. Cir. 2018)......................................................................23, 24

*Simeon Management Corp. v. FTC,*
579 F.2d 1137 (9th Cir. 1978) ............................................................................8

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011) ............................................................................6

*Tait v. BSH Home Appliances Corp.,*
289 F.R.D. 466 (C.D. Cal. 2012)......................................................................11

iii

*White v. First Step Group LLC*,
No. 2:16–cv–02439–KJM–GGH, 2017 WL 4181121 (E.D. Cal. Sept. 19, 2017) ........................................................................................8

**Federal Statutes**

12 U.S.C. § 5491 ................................................................23, 24

12 U.S.C. § 5493 ........................................................................23

12 U.S.C. § 5531 ........................................................................16

44 U.S.C. § 3502 ........................................................................24

**Federal Regulations**

16 C.F.R. § 310.3 ................................................................16, 19

16 C.F.R. § 310.4 ................................................................12, 21

Telemarketing Sales Rule, 75 Fed. Reg. 48,458 (Aug. 10, 2010) ...........................8, 9, 10

**Other Authorities**

156 Cong. Rec. (2010) ................................................................24

S. Rep. No. 11-176 (2010) ................................................................24

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Defendant Freedom Debt Relief, LLC ("Freedom") was founded to help level the playing field for consumers dealing with unsustainable amounts of credit-card and other consumer debt. Freedom accomplishes this by helping its individual clients reduce or eliminate debts they enroll with Freedom. After almost fifteen years of successful settlements, Freedom has grown to become the nation's largest debt settlement company, having saved hundreds of thousands of clients more than $7 billion. Freedom's efforts on behalf of consumers besieged by debt collectors have never been more needed. Indeed, Plaintiff, the Consumer Financial Protection Bureau (the "Bureau"), has noted that it receives more complaints about debt collection practices than any other category of complaints. However, the Bureau here does not aim to stop harmful lending practices or prevent debt collection abuses but instead seeks to punish Freedom's good-faith efforts to help struggling consumers reduce or eliminate debts.

Specifically, this litigation, without sufficient allegations of specific consumer harm, attacks two related resolution strategies that the debt settlement industry historically has employed when dealing with creditors. First, the Bureau targets the provision of "coaching," which helps a client negotiate directly with a creditor in rare instances when a creditor, endeavoring to maintain its leverage over a vulnerable consumer, claims that it will not negotiate directly with a debt settlement company. Second, the Bureau targets the strategy of prioritizing settlements of a client's debts, which maximizes the likelihood that one or more debts will be written off altogether, resulting in a zero-percent settlement. Although "coached" settlements and zero-percent settlements are relatively uncommon, the Bureau's position here, if allowed to prevail, would confer a significant advantage to creditors at the expense of overburdened debtors. Thus, at a policy level, the Bureau's position is both unjust and inconsistent; in any event, efforts to change industry practices should be pursued through rulemaking, not litigation.

At a factual level, the Bureau's Complaint is riddled with errors, as will be made clear if this case proceeds past the motion to dismiss stage. Indeed, it is disappointing that, although the Bureau has amended its Complaint, it still chooses not to correct a number of statements that it knows to be inaccurate.

But it is not necessary for this Court to assess the veracity of the Complaint's statements. Even if the Court accepts the Complaint's allegations on their face, it should nevertheless dismiss the Complaint because (i) it fails to state a claim upon which relief may be granted and (ii) the structure of the Bureau (whereby one single individual is endowed with vast powers over the nation's consumer financial services industry and is insulated from either Executive Branch or Legislative Branch authority) violates the Constitution's separation of powers principles.

*First*, the Complaint should be dismissed because none of its five counts, when viewed in light of the totality of the allegations made, states a claim upon which this Court may grant relief:

- Count I alleges that Freedom deceived certain clients by supposedly falsely telling them that it believed it could negotiate settlements with their creditors. However, the Complaint *also* acknowledges that Freedom did, in fact, negotiate settlements with those same creditors. Moreover, the Federal Trade Commission (the "FTC"), the primary regulator of the debt settlement industry, considered and rejected a proposal that would have required debt settlement companies to state that certain creditors may not negotiate, which is what the Bureau claims Freedom should have done. Thus, the Bureau's action here is an impermissible attempt to regulate retrospectively via litigation and impose on the industry a requirement previously considered and specifically rejected by the FTC.

- Count II alleges that it was deceptive for Freedom to charge fees for certain settlements. However, the Debt Resolution Agreement that Freedom enters into with its clients (the "Contract") makes clear that Freedom would charge a fee when

each enrolled debt was resolved.[1] The Bureau does not allege that Freedom ever charged a fee where a client's debt was not either settled or eliminated altogether, and ignores that, in all cases when Freedom collected fees, Freedom's clients specifically approved both the settlements and Freedom's fees.

- Count III alleges that the same practices were "abusive." But the Bureau alleges no *facts* supporting its assertion that these practices involved a material condition of Freedom's program or that Freedom's fees were unreasonable, as is required to state a claim of abusiveness under the Consumer Financial Protection Act of 2010 (the "Act"). The Complaint also fails to acknowledge not only the complete lack of consumer harm but also the substantial consumer benefits inherent in each settlement.

- Count IV alleges that Freedom failed to make certain required disclosures to its clients. The plain text of the Contract refutes this claim.

- Count V alleges that Freedom violated the Telemarketing Sales Rule and the Act by "charging fees in the absence of a settlement." But by the Bureau's own allegations, Freedom did not charge its clients a fee until a debt was either settled or eliminated altogether *and* the client had specifically agreed to pay the fee. The Bureau's addition of this count is a transparent attempt to evade time limits on its claims pursuant to the Act.

*Second*, the Complaint should be dismissed because the structure of the Bureau violates the Constitution's separation of powers doctrine. As numerous federal judges have concluded (including, for example, Judge Gutierrez of the Central District of California, Judge Preska of the Southern District of New York, and Judge Kavanaugh and other judges on the Court of Appeals for the District of Columbia Circuit), the Act

---

[1] A copy of the Contract incorporated by reference into the Complaint by the Bureau is attached as Exhibit A to the Declaration of Allen J. Ruby, and is cited to herein as "DRA." The Contract was amended several times during the period at issue, but the version attached appears to be the version referenced in the Complaint.

DEFENDANT FREEDOM DEBT RELIEF'S MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 3:17-cv-06484-EDL

violates the Constitution because it vests broad and unfettered power in one person and insulates that individual from accountability by prohibiting the President from removing that individual, except for cause, and prohibiting Congress from exercising oversight over the agency or the individual. As Judge Preska in *CFPB v. RD Legal Funding, LLC*, No. 1:17-cv-00890-LAP (S.D.N.Y.), discussed below, held just last month, this flaw cannot be remedied by severance of some portion of the Act because the defect goes to the very structure of the Bureau. Consequently, the only appropriate remedy is dismissal of the Complaint.

## FACTUAL BACKGROUND

### A.   *The Parties*

The Bureau is an independent agency of the United States created by Title X of the Dodd-Frank Act. The Bureau is headed by a single director who alone has the authority to propound regulations, issue civil investigative demands and file lawsuits against certain consumer financial services companies and their employees. The director cannot be fired or otherwise removed from office unless he or she has engaged in misconduct, and the director is not subject to any form of Congressional oversight.

Freedom is a consumer debt settlement company that, since 2002, has helped hundreds of thousands of clients struggling with consumer debt successfully negotiate and resolve their financial obligations on favorable terms. (FAC ¶¶ 6, 8.) Defendant Andrew Housser is Freedom's co-CEO. (FAC ¶ 7.)

### B.   *Freedom's Business*

Freedom offers its debt settlement program to consumers suffering severe financial hardship—*i.e.*, who are substantially overburdened with debt and unable to meet their repayment obligations. (FAC ¶¶ 8, 14.) Freedom provides its clients with a viable alternative to personal bankruptcy, which could cause lasting damage to their creditworthiness. Freedom aggressively and successfully negotiates with creditors on behalf of its clients to obtain resolutions of their debts at significant discounts. (FAC ¶¶ 8, 9.)

If a potential client expresses interest in participating in the Freedom program, Freedom performs a suitability analysis to determine whether the program is appropriate for the consumer. (FAC ¶ 14.) Prior to enrolling a client, Freedom explains its debt settlement process in detail. Once the client enrolls, the client deposits a fixed sum, on a monthly or bimonthly basis, into a demand deposit account owned and controlled exclusively by the client (a "Settlement Account"), accumulating funds that can be used to settle the client's debts and to pay Freedom's fees. (FAC ¶ 9.) At the time of enrollment, Freedom prepares a "Schedule of Creditors and Debt," listing the client's creditors and amounts then owed. (FAC ¶ 15.) The schedule is attached as an exhibit to the Contract. (FAC ¶ 15.)

The Contract sets forth terms and conditions for Freedom's clients. Among other things, the Contract states, "We believe that each Creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts." (DRA § 2; FAC ¶¶ 25, 48.) The Contract also specifies the fees that clients agreed to pay Freedom for its services. Specifically, Freedom charges a client a fee, calculated as a percentage of the debt at the time of enrollment, for each account the client enrolls that is eventually resolved. (FAC ¶ 12; DRA § 5.) The first page of the Contract refers clients to Section 5, which provides, "We do not charge or collect any fee for our settlement services unless and until a Debt is successfully resolved." (DRA § 5.) Likewise, a pre-enrollment call script states, "NO FEES ARE ACCEPTED UNTIL WE SETTLE A DEBT and then only for the debt that was settled!" (FAC ¶ 31.) Elsewhere, the Contract states, "We will not charge any fee for our services until we successfully resolve a debt for you and you have made a payment toward the settlement of that debt." (DRA § 1; FAC ¶ 31.) Freedom charged the agreed-upon fee only after an enrolled debt was resolved to the client's satisfaction, whether that settlement entailed payment of a portion of the outstanding debt or forgiveness of the entire debt—that is, a zero-percent settlement. (FAC ¶ 34; DRA § 4(B) ("All settlement offers must be specifically accepted by you before we can accept any payment of fees from your Settlement Account.").)

# ARGUMENT

The Complaint alleges that Freedom engaged in practices that were either deceptive or abusive under the Act and that Freedom violated the Telemarketing Sales Rule's advance fee prohibition. The Complaint is peppered with inaccuracies and mischaracterizations about Freedom's business operations, but even taking the allegations as true, the Complaint fails to state a claim against Freedom because the allegations lack specificity, are contradicted by other allegations and as a whole do not meet the plausibility standard of Rule 12(b)(6). In addition, the Complaint should be dismissed because the Act is unconstitutional.

## I.    Legal Standard

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must accept as true all allegations of material facts in the complaint and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994). Dismissal of a complaint for failure to state a claim is proper where a plaintiff has not alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive a motion to dismiss, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (*en banc*). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* 550 U.S. at 555 (alteration in original). If the allegations in the complaint fail to state a plausible claim

for relief, "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558.

In considering a motion to dismiss, the Court may consider both the complaint and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds*, *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## II. Freedom's Statement of Its Belief That Creditors Would Negotiate With It Was Not Deceptive

Count I of the Complaint alleges that Freedom's statements regarding its ability to negotiate directly with creditors, specifically its representation in the Contract "that it believed all creditors . . . would work with Freedom to negotiate a settlement of debts" (FAC ¶¶ 47, 48), "constituted deceptive acts and practices" in violation of the Act because Freedom was aware of a "significant chance" that some creditors would not negotiate (FAC ¶¶ 47, 50). Count I fails to state a claim for three reasons: First, the FTC has expressly considered and rejected this theory of liability. Second, the Complaint does not allege sufficient facts to suggest Freedom's statement of belief that creditors would negotiate with Freedom was untrue, instead alleging vaguely that a handful of creditors would "often" refuse to negotiate. And third, the claim does not satisfy the materiality requirement because no client was required to pay Freedom unless his or her debt was, in fact, reduced or eliminated by a creditor.

### A. *FTC Rulemaking Preempts Liability for Not Disclosing Creditors' Stances Towards Negotiation*

Count I seeks to hold Freedom liable for "creat[ing] the false net impression that Freedom . . . would be able to negotiate directly with all creditors." (FAC ¶ 49.) Assuming, *arguendo*, that Freedom created this impression, it follows that, to avoid liability, Freedom would have needed to include a disclaimer that not all creditors will negotiate all debts with Freedom. Imposing this requirement, which the FTC explicitly

7

rejected, through litigation rather than regulation would violate Freedom's right to due process.[2]

Constitutional due process requires that "laws which regulate persons or entities . . . give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Accordingly, agencies may not seek liability for a defendant's conduct where the "lengthy procedural history" of the underlying regulatory scheme gives no indication that such conduct is impermissible. *See id.* at 254; *Ark. Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) ("[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un* regulated.").

In its 2010 amendments to the Telemarketing Sales Rule (the "TSR"), the FTC considered requiring, *but then expressly declined to require*, that debt relief service providers disclose that "not all creditors or debt collectors will accept" debt settlement efforts. Telemarketing Sales Rule Final Rule Amendments, 75 Fed. Reg. 48,458, 48,494 (Aug. 10, 2010). The FTC explained this decision, which it reached after almost two years of research, public hearings and administrative rulemaking, as follows:

> It is difficult to predict with certainty . . . the circumstances under which a particular creditor will or will not be willing to negotiate the debt with a third party. In fact, even those creditors that claim not to work with debt relief providers may do so in certain situations. . . . [T]he record indicates that many creditors and debt collectors settle at least some debts for some consumers, and creditor policies and practice may change depending on the length and severity of the delinquency, other features of the debt, or external factors such as the creditor's need for liquidity. Accordingly, the usefulness

---

[2] Prior to the enactment of the Act, the FTC had exclusive regulatory authority over consumer financial products, and courts continue to consult FTC precedents in interpreting the Act, particularly as to unfairness and deception. *See, e.g., White v. First Step Grp. LLC*, No. 2:16–cv–02439–KJM–GGH, 2017 WL 4181121, at *4 (E.D. Cal. Sept. 19, 2017) ("[T]he FTC in particular, in light of its 'accumulated expertise' regarding the 'expectations and beliefs of the public, especially where the alleged deception results from an omission of information instead of a statement,' is 'generally in a better position than the courts to determine when a practice is deceptive.'" (quoting *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir. 1978))).

of a general disclosure about the fact that not all creditors will negotiate debts would vary from case to case.

*Id.* at 48,494–95.  In other words, the FTC concluded that the disclosure the Bureau would require here is unreliable because it cannot be stated with certainty that *any* specific creditor will always refuse to work with a debt relief provider.  Consequently, Freedom had no notice that it was required to state that certain creditors may not negotiate.  *Cf. Fox*, 567 U.S. at 254.  The Bureau's attempt to impose that obligation now, through litigation rather than amendment of the TSR, denies Freedom its due process rights and therefore cannot be sustained.  *See id.*; *Ark. Elec. Coop.*, 461 U.S. at 384.

## B. *The Complaint's Admission That Freedom Did Negotiate With All Creditors Dooms Its Claim That Freedom's Statements Were Deceptive*

Count I also fails to state a claim because the facts alleged in the Complaint do not support the contention that Freedom misleadingly stated that it believed that "each creditor listed on Exhibit A will work with us to negotiate a settlement of your Debts." (FAC ¶ 25, DRA § 2.)  "An act or practice is deceptive if: (1) 'there is a representation, omission, or practice that,' (2) 'is likely to mislead consumers acting reasonably under the circumstances,' and (3) 'the representation, omission, or practice is material.'" *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016).  Although the Complaint makes a number of unsupported assertions about supposed creditor "policies," it alleges no facts that provide a plausible basis for concluding that Freedom's statements regarding its belief in its abilities to negotiate debts was in any way false or misleading.

In assessing the veracity of Freedom's statement of belief, it is striking that the Bureau—even after amending its Complaint—cannot identify a single creditor with whom Freedom was unable to negotiate settlements.  Instead, after Freedom raised this point in its first motion to dismiss (*see* ECF No. 33 at 8–9), the Bureau continues to allege that Freedom was "often unable" to negotiate with some creditors who purportedly had policies "against negotiating with debt settlement companies." (*Compare* ECF No. 1 ¶ 39 *with* FAC ¶ 42.)  This statement in the Complaint constitutes

9

an admission that Freedom was in fact *able* to (and did) negotiate with each of those creditors.  Likewise, the allegation that some creditors had "track records of repeatedly refusing to negotiate with Freedom" (FAC ¶ 26) stops well short of alleging that those creditors *always* so refused.  As the FTC noted, "[i]t is difficult to predict with certainty . . . the circumstances under which a particular creditor will or will not be willing to negotiate . . . with a third party" and "even those creditors that claim not to work with debt relief providers may do so in certain situations."  75 Fed. Reg. 48,494.  The simple fact is that, notwithstanding the Bureau's wishful thinking, Freedom did negotiate with every one of the Bureau's identified creditors.

Nor would any reasonable consumer have relied on the statements alleged in the Complaint.  "To determine whether a representation or practice is likely to mislead, courts examine the overall 'net impression' that it leaves on a reasonable consumer." *CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106-RS, 2017 WL 3948396, at *2 (N.D. Cal. Sept. 8, 2017).  Because not all of a company's statements about its product are guarantees, the reasonable consumer does not necessarily interpret all of those statements as such.  For example, in *CFPB v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2014 WL 12581776 (C.D. Cal. Nov. 25, 2014), the court rejected the Bureau's theory that a defendant's statements that consumers "'could' or ha[d] the 'opportunity' to" reach a certain result "necessarily suggest[ed] that" result, especially where the defendant's statements were truthful.  *Id.* at *7.  Statements held to be "deceptive" are typically in clearer language, accompanied by indicia of bad faith.  *See, e.g.*, *Gordon*, 819 F.3d at 1193 (noting "that consumers were, in fact, deceived"); *CFPB v. Corinthian Colls., Inc.*, No. 1:14-cv-07194, 2015 WL 10854380, at *3 (N.D. Ill. Oct. 27, 2015) (sustaining default judgment based on intentional misreporting, miscalculation, and manipulation of data).  The statement at issue here cannot possibly be read by a reasonable consumer as a guarantee of 100% success with all creditors.

In sum, because the Complaint expressly acknowledges that Freedom was able to negotiate successfully with all creditors at least some of the time, the allegation that it was "deceptive" for Freedom to express its belief that it could do so again cannot stand.

### C. *The Complaint Fails to Plead the Existence of Any Consumer Harm*

Even if Freedom's statements of belief could have misled reasonable consumers, the Bureau does not and cannot allege that the alleged misrepresentations were material. "A 'material' misrepresentation or practice is one which is likely to affect a consumer's choice of or conduct regarding a product. . . . Thus, injury and materiality are different names for the same concept." *FTC v. Cantkier*, 767 F. Supp. 2d 147, 152 n.4 (D.D.C. 2011) (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 183 (1984)). Properly pleaded, the element of materiality thus requires a credible allegation of consumer reliance and resulting injury. *See FTC v. Lights of Am., Inc.*, No. SACV10–01333 JVS (MLGx), 2013 WL 5230681, at *48 (C.D. Cal. Sept. 17, 2013) ("To demonstrate reliance and resulting consumer injury, the FTC must prove that defendant made material representations."); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 484 (C.D. Cal. 2012) ("Consumers thus are likely to suffer injury from a material misrepresentation." (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165–66)).[3] The Bureau has made no such allegation here.

The Bureau does not allege actual harm to a single Freedom client caused by Freedom's alleged inability to negotiate with certain creditors. Nor could it. Freedom collected fees only when a client obtained a satisfactory resolution pursuant to a Freedom strategy *and* the client approved the resolution. (FAC ¶¶ 32–33, 38.) Freedom advised its clients of such in its Contract. (DRA §§ 5 ("We do not charge or collect any fee for

---

[3] To be sure, "[e]xpress product claims are presumed to be material." *FTC v. Springtech 77376 LLC*, No. C–12–04631 PJH (EDL), 2013 WL 5955395, at *3 (N.D. Cal. Oct. 28, 2013). But Freedom's mere commission to paper of a belief about the future course of settlement negotiations hardly amounts to a concrete "express product claim" that might trigger such a presumption. And there is no indication that the presumption, even if it applied, could not be rebutted where, as here, Plaintiff fails to allege any credible possibility of harm flowing from the statement.

our settlement services unless and until a Debt is successfully resolved."), 4(B) ("All settlement offers must be specifically accepted by you before we can accept any payment of fees from your Settlement Account.").) This approach is consistent with the TSR. *See* 16 C.F.R. § 310.4(a)(5)(i) (prohibiting advance fees for debt relief services). Moreover, the Complaint acknowledges that Freedom has been successful in resolving clients' debts. It states that Freedom resolved "debts in excess of $7 billion for over 450,000 consumers." (FAC ¶ 8.) With respect to creditors that purportedly had policies "against negotiating with debt-settlement companies," the Complaint alleges only that "Freedom was *often* unable to negotiate with creditors who had such policies." (FAC ¶ 42 (emphasis added).) The Complaint's unsupported assertions that creditors maintained such policies, lacking any indication of how such policies might have harmed consumers or limited Freedom's ability to settle debts (FAC ¶¶ 19–22), are legally and factually insufficient—particularly given the Bureau's contradictory admission about Freedom's ability to settle debts with these same creditors. Finally, even in instances where a creditor would supposedly refuse to negotiate with Freedom, Freedom was able to assist "consumers acting on their own . . . to negotiate a settlement with their creditors." (FAC ¶ 27.) From the reasonable consumer's perspective, results, not processes, matter, and Freedom delivered results.

The allegations of a "significant chance that Freedom would be unable to negotiate directly with certain creditors" (FAC ¶ 47) and that some "consumers had been enrolled in Freedom's program for months or years" before they engaged in a client-led negotiation (FAC ¶ 27) also do not suffice to establish materiality, for two reasons. First, the Court cannot accept a conclusory statement of materiality: Like the other elements of a claim of deception, materiality must be plausibly alleged and factually supported. *Gordon*, 819 F.3d at 1192. The Complaint contains no such support.[4] The Central

---

[4] The most the Bureau can offer is that a local San Francisco television station aired a story in 2011 in which (i) two Freedom clients complained about the lack of resolutions with Chase and (ii) Chase stated that it "does not work with debt-settlement companies." (FAC ¶ 18.) What is missing from this single example is (i) an allegation of what Freedom represented to these individuals some seven or more years ago, (ii) an actual
*(cont'd)*

District of California recently criticized the Bureau for failing to enter at trial evidence of materiality, that is, evidence that consumers would have acted differently in the absence of the purported deception. *CFPB v. CashCall, Inc.*, No. 2:15-cv-07522-JFW-RAO (C.D. Cal. Jan. 19, 2018), ECF No. 319 at 15 ("Indeed, the CFPB did not present testimony from a single consumer that suggests that a borrower would not have entered into a loan transaction if they had known that CashCall—not Western Sky—was the true lender."). Here, the Complaint similarly fails to allege that any Freedom client would have acted differently absent Freedom's statement. All the Complaint offers is the unsupported conclusion that Freedom's statements were material.

Moreover, the Complaint does not contain any quantification of the clients purportedly impacted by the alleged misrepresentation or the number of debts that were unable to be resolved as a result of the purported policies. Acting Bureau Director John M. Mulvaney has explained the centrality of assessing consumer harm in the Bureau's enforcement efforts. In a memo to all personnel, Acting Director Mulvaney stated: "When it comes to enforcement, we will be focusing on quantifiable and unavoidable harm to the consumer." Email from M. Mulvaney to _DL_CFPB_AllHands, 2 (Jan. 23, 2018), *available at* https://www.documentcloud.org/documents/4357880-Mulvaney-Memo.html (the "Mulvaney Memo"). But this Complaint contains no indication of any "quantifiable and unavoidable harm." All it avers is that for some periods of time some creditors purported to maintain policies against negotiating directly with Freedom.

Second, no reasonable consumer would have relied on Freedom's statement of belief. *See Morgan Drexen*, 2014 WL 12581776, at *7. Although the Complaint alleges that Freedom made this statement "[d]espite knowing that certain creditors would not negotiate with it" (FAC ¶ 23), the reasonable consumer, upon reading Freedom's "belie[f]," would understand that the statement conveyed only an expectation. Notably,

_____

*(cont'd from previous page)*

connection between the supposed inability to settle these two debts and the purported policy, (iii) any statement about whether Freedom did or did not, in fact, settle the debts in question, and (iv) any harm to either of these consumers.

the Contract makes it clear that "we cannot make promises or warranties as to the outcome of our efforts." (DRA § 4(C).) The possibility of an inability to negotiate directly with certain creditors, therefore, would not be a material deterrent to the reasonable consumer to contract with Freedom, especially given Freedom's long track record of successful debt resolution, which the Bureau acknowledges in its Complaint.

### III. Freedom's Representations About Its Fee Structure Were Not Deceptive

Count II of the Complaint alleges that Freedom made deceptive claims to clients about its fees, focusing on the following statements from the Contract and a call script:

- "NO FEES ARE ACCEPTED UNTIL WE SETTLE A DEBT and then only for the debt that was settled!" (FAC ¶ 31.)

- "We will not charge any fee for our services until we successfully resolve a debt for you and you have made a payment toward the settlement of that debt." (FAC ¶ 31; DRA § 1.)

The Complaint alleges that these statements were deceptive and misleading in those instances where "consumers had negotiated a binding settlement on their own" (FAC ¶ 33) or "a creditor, in the absence of a binding settlement, stopped collecting from a consumer, sometimes following a charge-off" (FAC ¶ 34). A review of the Contract and the call script shows that the quoted statements as a matter of law cannot be deemed materially misleading under the Act.

As a preliminary matter, each Freedom client approved each settlement before paying any fees for that settlement. (DRA § 4(B).) The Bureau can hardly claim that clients were materially deceived into paying settlement fees when they did not make any such payments without first approving the associated settlements with full knowledge of the terms of the settlements, Freedom's role in the settlements, and the fees to be charged for the settlements.

The Bureau's theory otherwise rests on an unreasonable belief that consumers would believe the above statements limited the charging of fees to cases in which Freedom *alone* participated in the negotiation of a resolution. This is not how a reasonable consumer would understand this language. What matters to a consumer is that

the debt was settled, not how or by whom. Thus, the reasonable reading of the Contract is that "no fees are charged unless and until a debt is resolved" and the Bureau does not contend that any Freedom client paid a fee to Freedom without resolution of the debt.

Such a reading is confirmed by a review of the entire Contract, rather than just the Bureau's quoted snippets. Specifically, the section of the Contract that sets forth the terms and conditions relating to fees states: "We do not charge or collect any fee for our settlement services unless and until a Debt *is successfully resolved*." (DRA § 5 (emphasis added).) In other words, the trigger for a fee assessment is that an enrolled debt is successfully resolved, not the method of its resolution.

With respect to collecting fees for zero-percent settlements, the Complaint likewise relies on a selective reading of the Contract and an overly narrow construction of what it means to "settle" a debt, rather than focusing on what a reasonable consumer would understand based on the entirety of the Contract. According to the Complaint, when Freedom's strategy resulted in a creditor's decision to *entirely abandon* its collection efforts on a debt enrolled in the Freedom program—inarguably the best possible result for the client—this did not constitute a "settlement" for which Freedom was entitled to assess a fee under the disclosures it provided. (FAC ¶¶ 57, 34.) As a theoretical matter, it makes little sense to say that a reasonable person would consider complete elimination of the debt as anything other than a successful resolution, but the Court need not even consider this hypothetical because Freedom did not charge any fee for any particular resolution unless and until the consumer authorized the payment of the fee for that specific resolution. (DRA § 4(B).) Thus, a consumer paid a fee only after knowing exactly what he or she was paying for and how it was obtained.

Grasping for any semblance of an allegation of consumer harm, the Bureau, without any evidence whatsoever, alleges that Freedom's debt settlement program "required consumers to deposit funds into dedicated accounts and instructed consumers [to] . . . withhold any further payments [to creditors]," which allegedly produced "extended delinquencies" that "negatively impacted consumers' credit, resulted in

15

consumers being charged late fees, penalties, and additional interest, and subjected consumers to ongoing collection activity and threatened and actual legal action." (FAC ¶ 37; *see also* FAC ¶ 38.) These risks are not allegations of consumer harm based on the specific conduct challenged by the Bureau. They are elements of debt-relief programs as a whole, contemplated by the regulation governing the industry, *see* 16 C.F.R. § 310.3(a)(1)(viii)(C), and fully disclosed by Freedom (*see* DRA § 3(B)(iv)). If the Bureau does not like these features of debt-relief programs, it should seek to change them by amending the regulation, not by prosecuting *ad hoc* litigation. Moreover, the Contract alerts consumers to every one of the risks the Bureau decries here. (DRA § 3(B)(iv)) (acknowledging that "Participation in a Debt Resolution Program" may "negatively affect your creditworthiness," "may cause the amount of a Debt to increase due to the assessment of additional interest and late and other fees" and "could result in ongoing collection efforts and, possibly, legal action").)

## IV.  Coaching Was Not an Abusive Practice

Count III of the Complaint alleges that providing coaching to a small number of clients to help them negotiate certain enrolled debts was "abusive" under the Act. To withstand a motion to dismiss, the Complaint must allege sufficient facts demonstrating that Freedom's practices with respect to coaching took "unreasonable advantage of . . . a lack of understanding on the part of the consumer of the *material risks, costs, or conditions* of the product or service." 12 U.S.C. § 5531(d)(2)(A) (emphasis added). The Complaint does not do any of those things and therefore Count III should be dismissed.

### A.  *Coaching Was Not a Material Risk, Cost or Condition of Freedom's Debt Settlement Services*

The Complaint does not allege facts plausibly suggesting that the possibility of coaching was a "material risk, cost or condition" of Freedom's debt resolution program.

First, as made clear by the absence of such an allegation in the Complaint, clients were under no obligation to agree to direct contact with any creditor. Rather, a client was free to decline coaching and request that Freedom continue to attempt a settlement with

that creditor, or the client could voluntarily withdraw such debts from the program without penalty. (FAC ¶ 16.) That a client was under no obligation to engage in a coached settlement means that coaching could not possibly constitute a material risk, cost or condition to the enrolling client.

Moreover, coaching is not a risk, let alone a "material" risk, because it can result in only one of two possible outcomes: a debt is either resolved or it is not. The first of these outcomes improves the client's position; the second leaves the client no worse off. Risk, by definition, requires downside exposure. Coaching did not create such exposure.

Nor was coaching a cost to any client. The Complaint contains no allegation that Freedom imposed a cost of any kind for accepting coaching. In fact, Freedom would collect a fee, whether it provided coaching or negotiated directly with the creditor, only where the client was satisfied with the result—that is, where the client chose to agree to a negotiated settlement of their debt. (DRA §§ 4(B), 5.) And the fees did not vary based on circumstance.

Finally, coaching was not a "condition" of enrollment or remaining in the Freedom program. Coaching was rare. It was not advisable for every client and even when it was advisable there was no requirement that the client accept it. In addition, the client could decide to withdraw certain debts from the program without penalty while continuing to enlist Freedom's assistance with respect to remaining debts. Nothing suggests that coaching on a particular account was a precondition for entry into, or remaining in, the program, and the Complaint contains no contrary allegation.

Second, even if coaching were a risk, cost or condition, the Bureau has not alleged facts that demonstrate that the risk, cost or condition was material to any client. Instead of alleging such facts, the Bureau speculates that there may be some hypothetical clients "who reasonably might have chosen not to enroll if they understood that they might have to negotiate with creditors themselves" or "to mislead those creditors during negotiations." (FAC ¶ 69.) This assertion, unsupported by any averment of any consumer who "might" so have chosen, is pure conjecture and ignores that the rare instances of coaching

provided clients with strategic guidance to enable them to more effectively deal with creditors. The Bureau's remaining allegations—that Freedom would attempt to resolve accounts via client coaching after "months or years," causing "extended delinquencies" (FAC ¶ 68)—only repeat the immaterial recitations that the Bureau makes elsewhere (*see* FAC ¶¶ 27, 37–38). Without any sufficient factual allegation that clients who knew about coaching would not have enrolled in the program—that is, without more than the bare recitation of an element of its claims—the Bureau's claims of abusiveness must be dismissed. *See CFPB v. Intercept Corp.*, No. 3:16–cv–144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017).

Finally, the Complaint includes a head-scratching allegation that Freedom abused consumers by telling them that they should not disclose to creditors with whom they were negotiating how much money the consumers could pay to settle the debts or from where they got the money. (FAC ¶ 66; *see also* FAC ¶¶ 28–29.) Putting aside the fact that the Bureau's authority is to enforce laws designed to help consumers, not to rush to the aid of creditors, this allegation makes no sense. Creditors have no right to the financial information the Bureau claims was withheld, whereas disclosing that information would have produced a dramatic financial detriment to the client. An alleged practice encouraging consumers to avoid such a loss could hardly be considered abusive.

### B.  *Freedom Did Not Take Advantage of Its Clients*

The Complaint fails to plausibly allege that Freedom took "unreasonable advantage" of a consumer, as would be required to state a claim of abusive conduct.

As the Mulvaney Memo emphasizes, the Bureau must allege that the defendant "derived an advantage from its conduct" or somehow "profit[ed] by" it. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015) (finding specific, factually supported allegation that defendant's program was designed to produce economic benefit to defendant). Conclusory statements alone do not support such a finding. *Intercept Corp.*, 2017 WL 3774379, at *4 (dismissing complaint filed by the Bureau for its failure

to allege specific facts tending to show consumer injury or the defendant's "unlawful advantage").

In this case, the gravamen of the allegations is that Freedom misled clients by not adequately disclosing that there could be some potential circumstances in which Freedom charged fees for its coaching assistance rather than for direct negotiation with creditors. (FAC ¶ 27.) Critically, however, even with a coached settlement, Freedom did not receive compensation unless (i) the client had determined that coaching was a route that they were willing to undertake and (ii) the client actually achieved a debt settlement acceptable to him or her. (DRA § 4(B).) Freedom collected fees only when its clients obtained positive results (as judged by the client), and as such the conduct alleged by the Complaint cannot, as a matter of law, be considered abusive.

## V. The Plain Text of the Contract Reveals That Freedom Did Not Violate the TSR's Disclosure Requirements

Count IV of the Complaint asserts that "Freedom did not clearly and conspicuously disclose that if a client withdrew [from the debt resolution program], the client must receive all funds in the account, other than funds earned by Freedom," and that Freedom therefore violated a provision of the TSR (and by extension the Act) that requires such disclosure. (FAC ¶¶ 79, 81–82.) The relevant portion of the TSR states:

> It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: . . . Before a customer consents to pay for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner . . . to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, *if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service* in compliance with § 310.4(a)(5)(i)(A) through (C).

16 C.F.R. § 310.3(a)(1)(viii)(D) (emphasis added).

This allegation cannot be squared with the plain language of the Contract, which repeats almost verbatim the language of the TSR. Section 3(A) of the Contract states that

19

the consumer "will, at all times, own and control the Settlement Account." (DRA § 3(A).)

Section 6 provides: "You may terminate this Agreement and withdraw from our debt resolution program at any time, without any termination fee or other penalty . . . ." (DRA § 6.) Further, the Contract includes an Account Agreement between the client and Crossroads Financial Technologies, the administrator of the client's Settlement Account. (*Id.* at 11.) Section 2 of the Account Agreement contains the following provision, set off in an underlined passage: "<u>You have the right to close your [Settlement] Account at any time and receive the full balance, minus any earned but uncollected fees.</u>" (*Id.* at 12.)[5] These are exactly the disclosures contemplated by the TSR that the Bureau claims are absent from Freedom's materials. (FAC ¶ 79.) Their "clear and conspicuous" presence vitiates Count IV.

## VI. **Freedom Did Not Violate the Advance Fee Prohibition**

Count V of the Complaint newly alleges that Freedom violated the TSR's prohibition on debt-relief services' collection of fees prior to rendering services (the "Advance Fee Prohibition"). The prohibition states as follows:

> It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: ... Requesting or receiving payment of any fee or consideration for any debt relief service until and unless: (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; (B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and (C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either: (1) Bears the same proportional relationship to the total fee for renegotiating, settling,

---

[5] That this disclosure appears in the Account Agreement appended to the Contract rather than the Contract itself is irrelevant, both to the law and to the reasonable client. Among other reasons, the Contract directs clients to the Account Agreement, "a separate agreement between you and your bank," for all information regarding "the account terms and conditions." (DRA § 3(A).)

reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount . . . ; or (2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

16 C.F.R. § 310.4(a)(5)(i).   The Complaint asserts that some undefined aspect of Freedom's collection of fees violated the requirements set forth in subsections (A), (B), and (C) of the Advance Fee Prohibition.  (FAC ¶¶ 90–94.)

The Complaint does not articulate any of these claims.   There is simply no allegation in the Complaint that even suggests that Freedom sought fees from any client prior to the resolution of any debt, let alone prior to the client's approval of that resolution.  To the extent the Bureau's contention is that Freedom could lawfully charge a fee on a settlement of one dollar, but that it would violate the law to charge fees on a *better* settlement of *zero* dollars because the client does not make a payment to the creditor, this argument is as nonsensical in the context of the Advance Fee Prohibition as it is in the context of the Act.  *See supra* Section III.  Nor does the Complaint allege any facts whatsoever to support a contention that Freedom's fees did not comply with the proportionality requirement.   In fact, the Bureau admits that Freedom's fees *were* calculated as a percentage of the total debt (FAC ¶ 12), just as 16 C.F.R. § 310.4(a)(5)(i)(C)(1) requires.

The Complaint, in short, is utterly devoid of any factual basis for its new tacked-on theory of liability under the TSR.  The Court should dispose of Count V accordingly.

## VII.   The Act Is Unconstitutional

The Complaint must also be dismissed because the provision in the Act insulating the Bureau director from Executive or Legislative check violates Article II of the U.S. Constitution, and there is no way to sever the offending provision from the statute without resulting in a statute that the Congress clearly indicated it would reject.

A.     *The Grant of Unchecked Power to the Bureau Director Violates the Constitution*

As a different Ninth Circuit district court has held, the Act is unconstitutional because it impermissibly interferes with the President's constitutional responsibility to "take Care that the Laws be faithfully executed." *See CFPB v. D & D Mktg.*, No. CV 15-09692 PSG (Ex), 2016 WL 8849698, at \*4 (C.D. Cal. Nov. 17, 2016), *interlocutory appeal pending*, No. 17-55709 (9th Cir.). Appeals of this issue are pending both here in the Ninth Circuit and in the Fifth Circuit. *See CFPB v. D & D Mktg.*, No. 17-55709 (9th Cir.); *CFPB v. Seila Law LLC*, No. 17-56324 (9th Cir.); *CFPB v. Future Income Payments, LLC*, No. 17-55721 (9th Cir.); *CFPB v. All American Check Cashing, Inc.*, No. 18-90015 (5th Cir.). This Court should follow the reasoning of Judge Gutierrez in the *D & D Marketing* case and others and hold the Act unconstitutional. Further, it should follow Judge Preska's reasoning and conclude that the only proper remedy for the violation is dismissal. *CFPB v. RD Legal Funding, LLC*, No. 1:17-cv-00890-LAP, (S.D.N.Y. June 21, 2018), ECF No. 80 at 99–100.

The Constitution grants the President the "power to oversee executive officers through removal" that "the Legislature has no right to diminish or modify." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492, 500 (2010) (quoting 1 Annals of Cong. 463 (1789) (Madison)). "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," *id.* at 484, and thus the President "must have the power to remove [executive officers] without delay," *Myers v. United States*, 272 U.S. 52, 134 (1926). As *Free Enterprise Fund* makes clear, restrictions on President's removal power are permissible only "under certain circumstances," 561 U.S. at 483, such as when the officer is part of a multi-member "body of experts," or an inferior officer with limited tenure and narrow scope of powers. *See Humphrey's Executor v. United States,* 295 U.S. 602, 624 (1935); *Morrison v. Olson,* 487 U.S. 654, 671–73, 695–97 (1988).

Neither circumstance is present here. The Bureau director, unlike a Commissioner

of the FTC or the Securities & Exchange Commission, is not simply one part of a multi-member body of experts. The director alone determines what enforcement proceedings to bring against which persons and entities for which sanctions and penalties. In addition, the director may unilaterally appoint all subordinate officials and hire and pay all Bureau employees outside the civil service regime. 12 U.S.C. §§ 5491(b)(5)(A), 5493(a). Nor are the director's powers narrow. Rather, the Bureau director wields "power that is massive in scope" and "enjoys more unilateral authority than any . . . official [other than the President] in any of the three branches of the U.S. Government." *PHH Corp. v. CFPB*, 881 F.3d 75, 166 (D.C. Cir. 2018) ("*PHH II*") (Kavanaugh, J., dissenting).

In holding that the Act was unconstitutional, Judge Gutierrez in *D & D* relied upon the reasoning of the three-judge panel in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016) ("*PHH I*"), which held:

> In sum, the CFPB departs from settled historical practice regarding the structure of independent agencies. And that departure makes a significant difference for the individual liberty protected by the Constitution's separation of powers. Applying the Supreme Court's separation of powers precedents, we therefore conclude that the CFPB is unconstitutionally structured because it is an independent agency headed by a single [d]irector.

*Id.* at 36. Although the three-judge panel was reversed *en banc*, the dissenting judges reiterated this analysis. *See PHH II*, 881 F.3d at 167 (Kavanaugh, J., dissenting); *see also D & D*, 2016 WL 8849698, at *4. The District Court for the Southern District of New York recently reached the same conclusion as those judges, *see RD Legal Funding*, ECF No. 80 at 100, and the Fifth Circuit has certified an interlocutory appeal posing the same question, *see All American*, No. 18-90015 (5th Cir.).

B. *The Only Adequate Remedy for the Act's Constitutional Defect Is Dismissal*

If the Court determines that the for-cause-removal provision in the Act violates the Constitution's separation of powers principles, the Court should rule that the litigation here is void *ab initio* and dismiss the Complaint on that ground. Although the court declined to do so in *D & D* on the ground that the for-cause-removal provision could be severed from the Act, the Court should adopt the persuasive reasoning of Judge

23

Henderson's *PHH II* dissent, which explains why the for-cause-removal provision in the Act cannot be severed from the rest of Title X and the appropriate remedy is to invalidate Title X altogether. 881 F.3d at 160–64 (Henderson, J., dissenting).

Although Dodd-Frank contains a severance clause, 12 U.S.C. § 5302, the Supreme Court has made clear that severance is proper only when it will not result in "legislation that Congress would not have enacted." *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 685 (1987). As Judge Henderson explains, severing the removal provision "would yield an executive agency entirely at odds with the legislative design" and a statute that "the Congress would not have enacted." *PHH II*, 881 F.3d at 160 (Henderson, J., dissenting).

There is abundant evidence to support this conclusion. The legislative record shows that the Congress intended to create an agency "completely independent, with an independently appointed director, an independent budget, and an autonomous rulemaking authority." 156 Cong. Rec. 12,434 (2010) (Statement of Rep. Maloney). The record is replete with references to the desire that the Bureau director be "independent." *See* S. Rep. No. 111-176, at 24, 174; 156 Cong. Rec. 12,436 (2010) (Statement of Rep. Meeks); *see also* 156 Cong. Rec. 13,135 (2010) (Statement of Sen. Cardin). This independence, integral to the Bureau, is repeatedly memorialized in statutory text. *See* 12 U.S.C. § 5491(a); 44 U.S.C. § 3502(5). Indeed, numerous legislators, including the Bureau's architect, confirmed this intent in *PHH I*, stating that severing the removal provision would "fundamentally alter[] the CFPB and hamper[] its ability to function as Congress intended" and would be "at odds with Congress's design." Brief *Amici Curiae* of Current and Former Members of Cong. at 2, 5, *PHH I*, 839 F.3d 1 (D.C. Cir. 2016) (No. 15-1177), 2016 WL 6994388. Judge Henderson correctly concluded from an exhaustive review of this record that severance of the removal provision "would yield a mutant CFPB," too deeply subject to presidential authority to have passed the Congress. *PHH II*, 881 F.3d at 163 (Henderson, J., dissenting). The District Court for the Southern District of New York recently agreed with this assessment. *See RD Legal Funding*, slip op. at 100.

The removal clause insulating the Bureau director from accountability is unconstitutional and cannot be severed without producing a law Congress would not have enacted. The Court should dismiss the Bureau's action as void *ab initio*.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court should dismiss the Complaint in full for its failure to state an actionable claim.

Respectfully submitted,

DATED: July 6, 2018

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/ Allen J. Ruby*_____
ALLEN J. RUBY
Attorneys for Defendant
FREEDOM DEBT RELIEF, LLC

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 6, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Plaintiffs and constitutes service under L.R. 5-1(h)(1).

*/s/ Allen J. Ruby*
ALLEN J. RUBY
Attorney for Defendant
FREEDOM DEBT RELIEF, LLC